# CHARLESTON.

WEST VIRGINIA & P. R. CO. *v.* HARRISON COUNTY COURT.

Submitted June 10, 1899—Decided December 2, 1899.

1. RAILROAD AID — *Condition Precedent— County Bonds.*

   If a proposal submitting to a vote of the people a subscription to aid the construction of a railroad provides that it "shall not be available or paid to the said railroad company until the roadbed of the same shall have been completed ready for the ties and rails," it is a condition precedent, and of the essence of the proposal and contract under it, and there is no right in the company to payment prior to such completion. The count court has no power to issue bonds under such subscription, and place them in hands of a third party, to be delivered to the company on such completion, in advance of such completion; and the deposit in escrow does not enlarge its rights, and it has no vested right under the deposit, because of such deposit, in advance of such completion of the road. (p. 273.)

2. SUBSCRIPTION FORFEITED—*Bonds Canceled.*

   An order of the county court under a vote of the people making a subscription to the construction of a railroad directs bonds to issue in payment, and to be deposited with a bank, to be thereafter delivered to the railroad company upon the condition that it shall complete the road, ready for ties and rails, by a given day, with the proviso that if the road should not be completed by that day the subscription should be forfeited, and the bank should deliver back to the court such bonds, and the road is not so completed by the day given. *Held,* that the subscription is forfeited, and the court may reclaim the bonds from the bank and cancel them. (pp. 273-275.)

3. TIME—*Compliance—Subscription.*

   A reasonable limit of time for the completion of a railroad in a subscription by a county to it is valid, and is of the essence of the subscription, and compliance with it is essential to entitle the company to the subscription. (p. 278.)

4. LIMIT—*Construction—Vote.*

   A county court making a subscription to the construction of a railroad may insert a limit of time for its completion, or any terms and conditions reasonable and prudent to protect

the public, not contravening anything in the vote of the people or in the statute. (p. 277.)

5.    Terms—*Condition—Estoppel.*

A railroad company accepting a county subscription as made by a county court accepts it as tendered by the county court, with all its terms and conditions, and is estopped from saying that such terms and conditions are void or unreasonable. (p. 278.)

6.    Time—*Subscription—Forfeit.*

If a railroad company engage, in consideration of a county subscription to its work, to complete its railroad by a given time or forfeit the subscription, and fail therein, a court of equity will not relieve it from the forfeiture. (pp. 280-281.)

7.    Contract—*Relief—Equity.*

If one asks equity to relieve him from the consequences of his failure to perform his contract, in cases where such relief may be given, yet, if he does not aver and show clearly a present ability to perform, no relief will be given him. (p. 281.)

Appeal from Circuit Court, Harrison County.

Action by the West Virginia & Pennsylvania Railroad Company against the County Court of Harrison County. Decree for defendant, and plaintiff appeals.

*Affirmed.*

C. W. Lynch and Benjamin Wilson, for appellant.

Davis and Davis, W. P. Hubbard, and Melville D. Post, for appellee.

Brannon, Judge:

The county court of Harrison County submitted to its voters a proposition for the county to subcribe one hundred and fifty thousand dollars in aid of the construction of a railroad from the Pennsylvania state line to Clarksburg,—"said subscription not to be available or paid to the said railroad company until the road bed of the same shall have been completed ready for the ties and rails from the said Pennsylvania line to said town of Clarksburg," and on 17th of May, 1881, the voters approved the subscription.    No particular corporation was named in the order submitting the question to the voters.    On the 27th of May, 1884, the county court made an order stating that such subscription had been so approved, and that a corporation nam-

ed the West Virginia and Pennsylvania Railroad Company
had undertaken the railroad, and appointing agents on the
part of the county to make the subscription in behalf of the
county. This order provided that the subscription
should be paid in the bonds of the county, payable 1st of
January, 1907, and prescribed the form of bond and cou-
pons, and directed said agents to cause the bonds to be
prepared as soon as possible, and directed the agents,
after execution by the president and clerk of the court,
to deposit such bonds in the custody of the Merchants'
National Bank of West Virginia, provided said railroad
company deposit with the same bank, for the county, cer-
tificates for one hundred and fifty thousand dollars of its
stock. This same order provided that the bank should
hold the bonds and stock on certain conditions,—among
others, that it should be the duty of said agents, or such
other persons as the court might appoint, to ascertain
when the road was completed according to the terms of
the subscription, and when they should certify to the bank
and court that the construction of the road, ready for ties
and rails, had been completed in good faith, then the court
should order the bank to deliver to the railroad company
the bonds, and at the same time to deliver to the county court
said certificates of stock; and the order contained this pro-
viso: "Provided, that should the said railroad company not
comply with this subscription by completing its roadbed
before the first day of January, 1887, ready for the ties and
rails, this subscription shall be forfeited." It further
provided that "in the event of such forfeiture the bank
shall deliver up to the respective parties the bonds and
stock aforesaid." The bonds and stock were deposited
with the bank, and remain with it. Some little work has
been done in the construction of the railroad, but it has
never been made ready for ties or rails. The work done
is merely nominal,—colorable. In September, 1888,
three hundred and twenty-five voters and tax-payers pe-
titioned the county court to rescind the order of the court
making the subscription; but the court decided that "said
order should not be rescinded, nor should said bonds be
cancelled." A similar proposition was lost in December,
1888, before the court. As it was proposed by or for the

county court at its June term, 1898, to declare the subscription forfeited and cancel said bonds, the said railroad company filed a bill of injunction against the county court to restrain it from doing so, and, having obtained an injunction, the case was heard in the circuit court; and a decree was entered dissolving the injunction, declaring that the railroad company had forfeited its right to the subscription and to the bonds, and adjudging subscription and bonds null and void, and that the county court had the right to, and should upon delivery to it, cancel said bonds, and directing it to do so, and directing the bank to surrender them to the county court. From this decree the railroad company appealed.

At the outset a question presents itself, very material in the solution of this case. What power had the county court to prepare, issue, and deliver these bonds in escrow to the bank when the railroad had not been so far completed as to be ready for ties and rails? The statute provided that a county subscription should be paid in cash or in its bonds, and therefore bonds are per se payment of a county subscription. The vote of the people was that the subscription should not "be available or paid until the roadbed shall have been completed, ready for the ties and rails," from the Pennsylvania line to Clarksburg; plainly meaning that, while there could be the act of subscription, there could be no bonds—no right to make or deliver them absolutely or in escrow—until the road was ready for ties and rails. I fail to see any power in a county, under such a direction from the people and statute, to make any delivery in escrow so long before the day of payment. Take vote and statute together, and they say that only upon one event could the bonds be delivered,—that is, when the road should be ready for ties and rails,—and then an absolute delivery to the company as an actual payment. The company grants that it yet has no right to the bonds, but claims that this escrow somehow gives it a right to demand its continuance; but how can it rely upon rights under an escrow when there could be no escrow? The company could have no vested right to the bonds till the road was ready for ties and rails. The vote must not be departed from as to matters on which it speaks. When it fixes

terms and conditions it requires little authority to show that they must be observed. *Neale* v. *Wood County Court*, 43 W. Va. 90(27 S. E. 370). As there shown (page 104, 43 W. Va., and page 376, 27 S. E.), and below shown, where completion of the road is a precedent condition to delivery of bonds it is strictly enforced. It is clear law that there is no power in a county court to subscribe for the county without statute, and it must conform in doing so to the directions of the vote and statute in material matters. They are the chart of its authority. When a vote and statute say that bonds can be delivered only when the road is completed, the county court can act then—then only—in making delivery and payment. It cannot make delivery in escrow so as to vest any rights. Did the people intend that their bonds should be executed years in advance and deposited in escrow, so that if, by any means, they would get out into the world, they would have to pay them, or be endangered as to payment? Did they think they authorized bonds to mature in 1907, when the road might not be ready for ties until a year before their maturity? Surely it was not contemplated by them that taxes would be raised for interest and sinking fund before the road was ready for ties, but if not raised the whole principal might fall on them, to be paid within a few years, —a grievous load the people never dreamed of. They thought their bonds would bear date from the date when the road was ready for ties, and would mature in a given time thereafter, and not until then would the time of indulgence or taxes begin to run against them. The doctrine relied on by counsel, stated in 6 Am. & Eng. Enc. Law, 863, that one party to an escrow cannot revoke it and destroy another's right, is sound; but this rule presupposes a valid, lawful, binding escrow. But we find in the improved second edition of that work (volume 11, p. 352) that a depositary may and should redeliver on failure to perform a condition of the deposit. Therefore I cannot see how the company can claim any vested right under this deposit in escrow. The county court had the naked power to make delivery to the company of the bonds in payment of the subscription when the road was ready for ties, not to deliver in escrow years ahead.

After writing beyond this point I meet with the case of *Board* v. *Brush*, 77 Ill. 59, where bonds had been voted to a railroad, deliverable on its completion to a town, and the county court made an order for the deposit with three persons, in trust for the company, of certain bonds, undated, with power in them to date them of the date of delivery to the company, and deliver them on completion of the road. True, that order gave the trustees power to say when completion took place, whereas the Harrison court order has the prudent provision that it only could order the bank to deliver. But the reasoning of the Illinois court applies to this case. It says that the law and voters intended only the court to dispose of the bonds; that the court could not delegate the function of delivery to strangers owing no obligation to the county; that dangers to the public might ensue,—and condemned the action of the county court for such delegation of authority on general principles.

I observe that in *Satterlee* v. *Strider*, 31 W. Va. 781 (8 S. E. 552), a committee was appointed to take charge of bonds and deliver them as work progressed, they deciding when the company was entitled to them; but the point of power to constitute this committee was not in contestation. The case, however, supports the Harrison court in recognizing the right to revoke the escrow trusteeship. That deposit in escrow did not enlarge the rights of the company to those bonds. It does not—cannot—give it rights which it has not by the vote of the people. Its rights must be judged as if that deposit had never been made. It has no right to have these bonds kept in that bank, because the court had no right to make any deposit to enlarge the company's right beyond the vote of the people, and, further, because these are not such bonds as it would be entitled to, since these bear date in 1884, and mature 1st of January, 1907, whereas the bonds it would be entitled to would bear date at the completion of the road, running a prescribed period after completion, and none of the period before.

But say that I am in error in the opinion above. What then? I answer that the company has no right to prevent the county from taking up and destroying those bonds.

I need not give authority to show that, if the terms of the deposit in escrow control, the county has the right to do this; for it would be only a carrying out of the terms of deposit in escrow.   11 Am. & Eng. Enc. Law (2d Ed.) 352. Those terms say that if the railroad company should not complete its road, ready for ties and rails, by January 1, 1887, the subscription should be forfeited; the bank should surrender to the county its bonds, and to the company its certificates of stock.   But it is strenuously contended that as the vote of the people fixed no date for the completion of the work, this limitation inserted by the county court is void,—an unwarranted condition superadded to the popular vote.   As above stated, the vote, so far as it speaks, controls; and if the clause in the county court's order that the road must be finished by the 1st of January, 1887, at all contravened the vote, that clause would be void.   But that vote is utterly silent as to time of completion.   Is it to be unlimited time, the contingent liability arising from the subscription becoming at any time in many years to come an actual debt, without regard to changed conditions and circumstances?   Harrison County wanted another railroad, competing with the Baltimore and Ohio Railroad, then its only means of outlet for the great wealth of coal and live stock enriching that fine county, and it wanted it then, or in a reasonable time; and if this company should fail, as it has for eighteen years since the vote, should the county be tied down from looking to another quarter for relief?   It could not do so with this liability over it.   There would be no mutuality in allowing the company indefinite, unlimited time.   Reason and law unite in saying that, as the people had not fixed a limit, there must be some authority to do so.   Reason says there should be a reasonable time.   That was given.   Statute law says that when the people have voted a subscription the county court shall make it "on such terms as they may deem advisable." Code 1891, chapter 39, section 24.   What could more fitly fall within the word "terms" than imposing a reasonable limitation in time for the completion of the work, and prevent an embargo upon the county of indefinite duration? Counsel argues that section 58, chapter 54, Code, says that subscriptions shall be made "upon terms and conditions

specified in the order under which the vote is taken."
That is where the vote fixes terms and conditions, not as
to things material to protect the county in the transaction
not touched by the order of submission.   That order may
insert conditions or may not.   Section 24, chapter 39, au-
thorizes the court to pass an order touching the proposed
subscription, only requiring that it shall specify the work
to which the aid is to be given, and the amount of that aid,
but no further specifying what it shall contain, and simply
submitting the question to the people, and then leaving
details of terms and conditions to the court.   The very
section before section 58, on which the counsel relies, says .
that subscriptions shall be made as prescribed by section
24, chapter 39, and we have seen what it says.   We must
read both sections together.   One says that the subscrip-
tions shall be on such terms as the court deems advisable;
the other, on such as the order of submission prescribes.
We can harmonize the sections—give each an office—by
saying that when the vote prescribes terms and conditions
they must be followed, but, so far as the vote does not give
them, the county court may.   Section 57, chapter 54, not
only says that a subscription to a railroad may be made
in the manner prescribed by section 24, chapter 39, but
adds that "all the provisions of said section shall be appli-
cable to such subscription," thus including that clause giv-
ing the court right to fix terms.   "When no conditions
are required by law a municipal corporation may make the
subscription on such terms as are deemed necessary to
protect its own interest.   The courts have uniformly held
that an authority to subscribe for stock in aid of a railway
includes authority to make a conditional subscription."
Hainer, Mod. Law Mun. Sec. § 192; 2 Elliott, R. R. § 852,
citing many cases.

The county court thus possessing power to fix terms
not fixed by the vote, the only question is whether its
terms are reasonable, since I do not suppose it can fix
arbitrary terms, virtually depriving the railroad of the
aid, and defeating the benefit designed for the people from
the public improvement.   The terms given as to time for
part completion are obviously reasonable,—two years and
seven months for a railroad of about sixty-five miles.   It is

the law of all executory contracts that, where no time for performance is fixed, the law steps in and fixes a reasonable time. *Boyd* v. *Gunnison*, 14 W. Va. 1. Thus, the time fixed in the order of subscription is lawful and reasonable, and does not vitiate it. The voidness of this limitation is the shibboleth of the railroad's case.

Another point decisive against the company when it pleads the voidness of this limitation is its own act of acceptance, shown by its deposit of certificates of·stock with the bank. It asked this deposit of bonds in advance of work. It accepted the court's order with the time limit in it, and is estopped to say this limit is illegal or unreasonable. This order of the court is the contract between company and county, and, if a corporation agree to a contract, it is bound by it as would be an individual,—by its letter, reasonable or not, legal or not, unless *contra bonos mores*. This company was not mentioned in the order submitting the subscription to vote, and therefore all its rights were born of the court's order containing this time limit, and it must take it as it is. It has no right outside of it, as it is the contract. *Satterlee* v. *Strider*, 31 W. Va. 787, (8 S. E. 552). If not satisfactory to the company, why accept the order? "It is clear that a subscription made on special terms must be accepted precisely as offered, or not at all. Any variance from the terms of subscription would, at most, constitute a counter proposition." 1 Mor. Priv. Corp. section 86· In *Town of Danville* v. *Montpelier & St. J. R. Co.*, 43 Vt. 144, commissioners for subscription inserted conditions not warranted, and it was held that the company could only accept or reject it as it was. See *Brocaw* v. *Board*, 73 Ind. 543. "The plaintiff has the same liberty to accept as the defendant to propose terms. If they accepted them, they must be governed by them as they were made. We cannot change them or substitute others. The authorities requiring strict performance are numerous and pointed." *Railroad Co.* v. *Brewer*, 67 Me. 294.

I have above discussed the question of reasonable time so far as it enters into the question whether the time limit in the order of the county court makes that limit utterly void. I now refer to the matter of time in another aspect,—that

is, (1) whether time is the essence of this contract; and (2) whether, though it were not, still whether the period of fourteen years' failure to perform the work does not authorize the county on general equity principles, to have an end of the matter.

1.    Time is the essence of the contract.    If the county had given a few months, or a year, we might say it was not so intended; but, giving nearly three years, we may more readily say that both sides so regarded it.    Look at the strong language,—an express proviso that if the road should not be ready for ties by 1st of January, 1887, the subscription should be forfeited.    Time is often nonessential, where no one suffers by delay, as in many purchases of land; but the very nature of this case forces the conclusion that time was all-important to the county, as we cannot suppose that it intended to handcuff itself for an indefinite term against efforts to get elsewhere the benefit it had in view, should this company fail to perform the work.    *Ballard* v. *Ballard*, 25 W. Va. 470.    "Where the condition requires the railroad to be begun or finished before a certain date, it is held that time is of the essence of the contract, and the subscriber may be discharged from liability by a failure to comply with the condition."    1 Elliott, R. R. §§ 116, 117.    Where a town agreed to issue its bonds on "performance of certain conditions by a railroad company,— as that it should construct its road from a certain point to a certain point within a certain time,—if the company does not perform the condition within the time it cannot, though prevented by floods, compel the issue of the bonds, though it afterwards completes the line.    1 Wood, R. R. § 119, citing *Railway Co.* v. *Thompson* 24 Kan. 170.    Subscription, "provided the town of F. is made a point, and said road is put under contract in one year from 1st September, 1853."    *Held*, putting the road under contract was a condition precedent to right of company to recover, though the road was finished and running by September 1, 1858; Judge Dillon saying the letting to contract as stipulated might have hastened completion.    *Railroad Co.* v. *Boestler*, 15 Iowa, 555.    Same doctrine in *Ogden* v. *Kirby*, 79 Ill. 555; *Railroad Co.* v. *Bensley*, 2 C. C. A. 480, 51 Fed. 738; *Dermott* v. *Jones*, 23 How. 231,

16 L. Ed. 442; 1 Pom. Eq. Jur. § 455. Where condition
of completion is imposed, it is strictly enforced. *De
Voss* v. *City of Richmond*, 98 Am. Dec. 675; 15 Am. &
Eng. Enc. Law, 1284; 2 Elliott, R. R. § 117.

2. Suppose time were not of the essence of the contract.
Then there has been such long delay by the party under-
taking to perform the work that it cannot, as plaintiff, ask
equity to give relief, because the rule is that when a party
has been grossly negligent in performance of his con-
tract he cannot ask aid of equity; and more, especially is
this the case when he asks relief where time is of the es-
sence, and more still where he asks relief against express
provision of forfeiture. He must show, even in cases of
a nature proper for relief, that he has not been negligent
or careless, or that delay was caused by the other party .
*Brashier* v. *Gratz*, 6 Wheat. 528, 5 L. Ed. 322. A party
asking relief must show that he has been "ready, desir-
ous, prompt, and eager," or where he has been as prompt
as the nature of the case admits. Fry, Spec. Perf. §
22. Even equity will not relieve a party who has been in
default in performing a covenant. Judge Holt, in *Hukill*
v. *Guffcy*, 37 W. Va. 464 (16 S. E. 544), citing 2 Story, Eq.
Jur. § 1321, and 1 Pom. Eq. Jur. § 452. The great
volume of law on the subject of in what cases equity
will give relief seems summed up in a few words in 2
Story, Eq. Jur. § 1314, as follows: "In every such case
the true test (generally if not universally) by which
to ascertain whether relief can or cannot be had in equity
is to consider whether compensation can be made or not.
If it cannot, then courts of equity will not interfere. If it
can be made, and the penalty is to secure the mere pay-
ment of money, courts of equity will relieve the party on
payment of principal and interest." Therefore the case
falls, not under the doctrine of equity that, where the only
purpose of the clause is to compel payment of money, re-
lief will be given, but under that principle of equity that
where the object is not to secure merely money, but to en-
force a collateral act, as building or repairing, there equity
does not give relief. *Id.* §§ 1323, 1324. There is a differ-
ence between penalties and forfeitures in equity. In the
former relief is always given, if compensation can be made,

as the penalty is a mere security. In the latter, even if compensation could be made, it is not always given." *Id.* § 1320. Why talk about compensation in this case?

How can it be said that a period of over fourteen years of failure to do the work, making scarcely a commencement, ought not to debar the company from asking a court of equity to compel Harrison County to keep open its offer, even if time were not of the essence of the contract —First, from the very nature of the work; second, from the forfeiture clause in the contract? Perhaps time had changed things. How many of those voting for that subscription, parties to it, who expected to reap the benefit from the railroad proposed, had gone to their graves? We may, from judicial cognizance, say that another railroad, now nearly completed, renders that subscription inadvisable; and it was about to be begun when the county court was about to move to revoke this subscription, as it had a right to do after so long delay and change of conditions. And in this place it is appropriate to bring in another principle of equity jurisprudence, and that is that he who asks relief of it must at least show, if the court could excuse a forfeiture or negligence, that it would answer some purpose to do so, founded on the ability of the party to at last perform his contract. What assurance does the company give to Harrison County that it can build the railroad? None. The long delay disproves it. The bill simply says that owing to the financial depression for the last several years the company had been greatly hindered; but that now, "in a more prosperous financial condition of the country and the general business thereof," the company "is hopeful of procuring the necessary means to prosecute the work." A mere hope! It had failed, not only for the few years of depression, but through many years of growth and prosperity of the country. The officers of the road say in evidence that they cannot say when the road will be completed, and can give no assurance as to its success. They prove its treasury without any means at all. It has no contract for the building of the road.

The argument is presented that, if the bonds are allowed to rest, no harm can come to the county. Shall this heavy liability continue to hang over its people? Does it

not affect their deepest interest? Is it to hang a night-mare and incubus over them longer than fifteen years simply for the benefit of a railroad enterprise whose chance of success seems desperate? We can see why the county is entitled to have a definite settlement of this complication, plainly prejudicial to its important interests.

It is argued that as O. A. Tintsman took stock in the road, perhaps on the faith of the county subscription, his rights are to be regarded. He is not a party to this suit. He was bound to know of that time limit and forfeiture clause, and that the law would operate under them to end the county's liability in case of failure to complete the road. He is vice president. He bought stock in 1893, after nine years' failure to finish the road. He was on its line, and otherwise knew of such failure. But this is immaterial to the case. Is it possible to say that the clear right of one stockholder to be free from his subscription under the facts pertaining to it shall be defeated because another took stock, even on the faith of it?

It is useless to say much as to the refusal of the county court in 1888 to revoke the subscription. It was a mere act of indulgence and grace. It did not waive the public right. The fact that it did not choose in 1888 to enforce its rights does not debar it from so doing in 1898. The county court did not make any agreement not to revoke. How could it do so? How could it give away the public right under that forfeiture clause? What statute authorized it to do so?

To me, this is a very plain case in favor of Harrison County. I have written too much upon it, but have done so only in deference to the amount involved, the importance of the case, and chiefly in deference to the number, distinction, and ability of the counsel and their briefs. I have refrained from intimating any opinion upon the question of whether the charter existence of the railroad company has become extinct from nonuser or other cause. Counsel have ably argued it,—those for Harrison County contending that its corporate life has ended, and for that reason it has no right in the matter; but, as it is not necessary, I have avoided the discussion of that question. I have no opinion as to it. It cannot be necessary to prolong this

opinion to show that the county was not required to bring a suit to enable it to cancel the bonds. The terms of the deposit gave that authority, as I have shown above from 11 Am. & Eng. Enc. Law, 352. And the company has itself brought the matter into court, thus giving judicial determination.

*Decree Affirmed.*

(Note by Brannon, Judge:)

I meet with some cases since the foregoing opinion was filed which I think sustain it. In *Falconer* v. *Railroad Co.*, 69 N. Y. 491, where a condition was imposed by taxpayers in a railroad subscription that the road shall "be constructed before said bonds shall be delivered to said company or sold," and the commissioners appointed to carry out the subscription made an agreement with the company that when it complied with the condition they would make the subscription and deliver the bonds and then an amendment of the Constitution was adopted prohibiting towns from subscribing to railroads, and it was claimed that this agreement saved the subscription from death, it was held: That the "commissioners appointed to subscribe and issue bonds were subjected to the condition. They could neither issue bonds, nor subscribe for or take stock, or by any agreement bind the town, until the condition was complied with fully. They could not substitute an agreement by the company to comply with the condition, or any other agreement on its part, for actual compliance, and until such compliance they had no authority whatever to act in the matter." The court said that the agreement did not enlarge or change the right of the company, and the subscription, not being complete before the amendment, perished by reason of it. As to the force of time conditions of subscription, the position taken in the above opinion is strongly sustained by *German Sav. Bank* v. *Franklin Co.*, 128 U. S. 526, 9 Sup. Ct. 159, 32 L. Ed. 519, and *Young* v. *Clarendon Tp.*, 132 U. S. 340, 10 Sup. Ct. 107, 33 L. Ed. 356.